IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEIHINAHINA SULLIVAN,<br><br>Defendant. | CR. NO. 17-00104 JMS<br>CR. NO. 21-00096 JMS<br><br>ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE |

# ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

## I. INTRODUCTION

Before the court is pro se Defendant Leihinahina Sullivan's ("Defendant") July 22, 2025 Motion for Compassionate Release ("Motion"). *See* ECF No. 1699 in Cr. No. 17-00104 JMS and ECF No. 296 in Cr. No. 21-00096 JMS.[1] Because Defendant fails to demonstrate an extraordinary and compelling reason to reduce her sentence and, in any event, the court would deny the Motion based on a consideration of the relevant 18 U.S.C. § 3553(a) factors, the Motion is DENIED.

---

[1] Defendant was charged and pled guilty in two separate cases, Cr. No. 17-00104 JMS and Cr. No. 21-00096 JMS. The Motion was filed in both cases, and unless otherwise stated, all references in this Order are to Cr. No. 17-00104 JMS.

## II. BACKGROUND

On July 20, 2021, Sullivan entered a plea of guilty, pursuant to a plea agreement, to counts 1, 29, and 35 of a Fourth Superseding Indictment in Cr. No. 17-00104 JMS and to a single-count Information in Cr. No. 21-00096 JMS.[2] *See* ECF No. 1202 in Cr. No. 17-00104 JMS and ECF No. 6 in Cr. No. 21-00096 JMS. Those matters were consolidated for sentencing, and on March 28, 2023, Defendant was sentenced to a term of incarceration of 180 months in Cr. No. 17-00104 JMS and 24 months in Cr. No. 21-00096 JMS, with both terms to run consecutive, resulting in a total sentence of 204 months. *See* ECF No. 1530 in Cr. No. 17-00104 JMS and ECF No. 197 in Cr. No. 21-00096 JMS.

Defendant is 54 years old and presently incarcerated at Victorville Medium I FCI with a projected release date of February 25, 2034. *See* Find an Inmate, ("Find By Name" entering "Leihinahina Sullivan"), https://www.bop.gov/inmateloc/ (last visited October 2, 2025).

---

[2] Counts 1–7, 29–34, and 35–47 in the Fourth Superseding Indictment charged Defendant with wire fraud in violation of 18 U.S.C. § 1343. ECF No. 495. Each of these groups of counts related to a different scheme—Counts 1–7 involved a "tax fraud scheme," Counts 29–34 involved an "education fraud scheme," and Counts 35–47 involved a "credit card fraud scheme." *Id.*; *see also* Presentence Report, ECF No. 1514 at PageID.17817–17833. The single count information charged Defendant with aggravated identity theft in violation of 18 U.S.C. § 1028A (in relation to the wire fraud offense charged in Count 35 of the Fourth Superseding Indictment). ECF No. 1 in Cr. No. 21-00096 JMS.

Defendant filed the Motion on July 22, 2025, and a supplement to the Motion on August 4, 2025. ECF Nos. 1699 and 1705. The government filed a response on August 21, 2025, ECF No. 1709, and Defendant filed replies on September 16, 2025, and September 29, 2025, ECF Nos. 1717, 1724. At the request of the court, the government filed (under seal) Defendant's most recent Bureau of Prisons ("BOP") medical records on September 22, 2025. ECF No. 1723. The court decides the Motion without a hearing pursuant to Local Rule 7.1(c).

### III. **DISCUSSION**

**A.     Legal Standard**

Ordinarily, "a federal court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Wright*, 46 F.4th 938, 944 (9th Cir. 2022) (quoting *United States v. Keller*, 2 F.4th 1278, 1281 (9th Cir. 2021), and 18 U.S.C. § 3582(c)). Congress created a limited exception for modifying the sentence of a federal inmate who files a motion for "compassionate release" satisfying the substantive and procedural requirements of 18 U.S.C. § 3582(c)(1)(A). Section 3582(c)(1)(A), as amended by the First Step Act of 2018 ("FSA"), provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

>motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable, if it finds that—
>
>>(i) extraordinary and compelling reasons warrant such a reduction;
>
>. . . .
>
>and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  "As compassionate release derogates from the principle of finality, it is a 'narrow' remedy . . . and the court's disposition of a compassionate release motion 'is discretionary, not mandatory[.]'" *Wright*, 46 F.4th at 944–45 (internal citations omitted).  "[C]ompassionate release is not sentencing or resentencing.  The focus of compassionate release proceedings is not on what sentence is most appropriate given the defendant's background and crime; it is on whether new circumstances warrant discretionary relief." *United States v. Bryant*, 144 F.4th 1119, 1128 (9th Cir. 2025).

But the FSA itself does not define "extraordinary and compelling reasons."  "Instead, Congress stated that the Sentencing Commission, 'in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be

4

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.'" *United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021) (quoting 28 U.S.C. § 994(t)).

United States Sentencing Commission Policy Statement § 1B1.13(a) states, in relevant part, that a court may grant a motion for compassionate release if, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," the court determines that: extraordinary and compelling reasons warrant the reduction; the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and "the reduction is consistent with [§ 1B1.13's] policy statement."

Section 1B1.13 then sets forth several specific extraordinary and compelling reasons which may form—individually or in combination—the basis to reduce a sentence: (1) certain medical circumstances; (2) age coupled with health issues; (3) certain family circumstances; (4) being a victim of sexual or physical abuse while in custody; (5) other circumstances (or a combination of circumstances) "similar in gravity" to (1)–(4)[3]; and (6) an unusually long sentence.

---

[3] The Sentencing Commission "considered but specifically rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. Rather, they need be similar only in gravity . . . ." Supplement to USSG App. C, amend. 814, p. 207 (Nov. 1, 2023). Regardless, the Ninth Circuit has described this exception as "narrow." *United States v. Bryant*, 144 F.4th 1119, 1126 (9th Cir. 2025).

5

Further, "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason . . . . However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances" in determining whether and to what extent to reduce a term of incarceration. Guidelines § 1B1.13(d). "[C]ourts are bound by § 1B1.13 in deciding all compassionate release motions under § 3582(c)(1)(A)" and thus a defendant is ineligible for compassionate release if he does not meet the showing required under § 1B1.13. *Bryant*, 144 F.4th at 1124 (internal quotation marks omitted).

And although the court must consider "extraordinary and compelling" reasons and the § 3553(a) factors, it may deny compassionate release on any of these bases:

> First, the district court must determine whether "extraordinary and compelling reasons warrant" a sentence reduction. Second, the court must evaluate whether a reduction would be "consistent with applicable policy statements issued by the Sentencing Commission." Third, the court must consider and weigh the factors set forth in 18 U.S.C. § 3553(a) to decide whether the requested sentence reduction is warranted "under the particular circumstances of the case." Although a district court must conclude that a defendant satisfies all three predicates before granting a motion for compassionate release, it may deny compassionate release if a defendant fails to satisfy any of these grounds.

*Wright*, 46 F.4th at 945 (emphasis, footnote, and internal citations omitted). Thus, a district court may deny a compassionate release motion based solely on a

6

defendant's failure to show an "extraordinary and compelling" reason for release under § 1B1.13.  "[A] district court that properly *denies* compassionate release need not evaluate each step" in the "sequential step-by-step analysis" required by 18 U.S.C. § 3582(c)(1)(A).  *Keller*, 2 F.4th at 1284.  "Such a reading is compelled by the structure of the compassionate release statute, which treats its requirements as conjunctive."  *Wright*, 46 F.4th at 947 (citing *id.*).  "This structure necessarily dictates that a court may deny compassionate release at any stage of the § 3582(c)(1)(A) pipeline."  *Id*.

**B.    Exhaustion of Administrative Remedies**

        To satisfy § 3582(c)(1)(A)'s exhaustion requirement—a mandatory claim processing rule—a defendant must submit a request to the BOP that explains the basis for the relief sought and provides a proposed release plan.  *See* 28 C.F.R. § 571.61(a)(1)–(2); *Keller*, 2 F.4th at 1282.  Here, as the government acknowledges, Defendant has exhausted her administrative remedies.  *See* ECF No. 1699-3 at PageID.22397–22398 and ECF No. 1709 at PageID.22447–22448 n.2.

**C.    Defendant Does Not Present an Extraordinary and Compelling Reason, or a Combination of Such Reasons, Warranting Early Release**

        Defendant asserts that the court should grant her motion for compassionate release based on a totality of circumstances, including: (1) her medical condition, which centers around a right total hip replacement; (2) the

7

length of her sentence, coupled with conditions of confinement that are more severe than normal due to COVID-19; (3) her extraordinary rehabilitation; and (4) she has a low PATTERN (short for Prisoner Assessment Tool Targeting Estimated Risk and Needs) score.  ECF No. 1699 at PageID.22378–22382; ECF No. 1705 at PageID.22408; ECF No. 1717.  The court considers each argument individually and in combination.

First, Defendant claims in her September 16, 2025 reply that she has demonstrated extraordinary and compelling reasons under Guideline § 1B1.13(b)(1)(C)—that is, she claims that she is suffering from a medical condition relating to her hip replacement that requires long-term or specialized medical care that is not being provided and without which she is at risk of serious deterioration in health or death.  *See* ECF No. 1717 at PageID.22702.[4]  She states that her right hip "has dehabilitated [sic] me, causing me to walk with a walker and causing injury to my knees."  *Id*.  She also claims that she requires "24/7 care," that there is a "foreign object left in my incision which hurts and bleeds which needs evaluation, with intermittent low grade fever," and that she has had "no aftercare."  *Id*. at PageID.22702–22703.

---

[4] When Defendant filed the Motion on July 22, 2025, she was scheduled for, but had not yet received, the hip replacement.  The hip replacement surgery took place on August 11, 2025, *see* ECF No. 1717 at PageID.22703 and ECF No. 1723 at PageID.22917–22918, and was fully briefed in Defendant's September 16, 2025 reply.  ECF No. 1717.

This claim fails for two reasons. First, even if true, Defendant has not shown that her present hip condition "requires long-term or specialized medical care that is not being provided" and that, without that medical care, she is "at risk of serious deterioration in health or death." Guideline § 1B1.13(b)(1)(C). At best, Defendant has shown that she has some post-operative complications. And second, the medical records do not support Defendant's assertions. During a medical evaluation four days after her surgery Defendant reported that "her pain is 5/10. She is using a walker which is helping her walk. She saw PT this morning." ECF No. 1723 at PageID.22786. Medical notes from August 20, 2025, report that Defendant was cleaning her incision daily with water and applying bacitracin, that she denied having any fever or chills and that she claimed that she had "no" pain. *Id*. at PageID.22777. On September 3, 2025, the medical records reflect "no" pain and "27 staples removed from R hip, wound well healed and approximated." *Id*. at PageID.22773–22774. Records from September 11, 2025, reflect that Defendant reported doing well, and her ambulation was improving, the pain was 3/10, but she still presented with limited right hip mobility, strength, and coordination. She also reported having "regular pain from the incision," "fever/chill at night," and yellow discharge at the incision site, for which she was prescribed Bactrim. *Id*. at PageID.22767–22771.

These notes are not reflective—as Defendant claims—of a medical condition that requires "long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." Guideline § 1B1.3(b)(1)(C). Instead, they are reflective of someone with post-hip replacement discomfort, and an apparent infection at the incision site that was treated with a course of antibiotics. And the medical records certainly do not reflect—as Defendant claims—the presence of a "foreign object" near the incision site.

Defendant has also failed to show that her medical condition meets the § 1B1.13(b)(1)(B) criteria, which requires a showing that a serious medical condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Finally, under § 1B1.13(b)(5), Defendant has not shown that her hip condition, whether by itself or in combination with other reasons set forth in § 1B1.13(b)(1)–(4), are "similar in gravity" to the reasons set forth in § 1B1.13(b)(1)–(4).

Next, Defendant states that her "sentence is 17 years, I have served more than half of my sentence with First Step Act, Good Time Credit ("GTC"), and Second Chance Act ("SCA") for a total of 12.9 years." ECF No. 1699 at

PageID.22379. Without explanation, she also claims that her sentence is made more severe than what was intended due to COVID-19. *Id.* But under § 1B1.13(b)(6), an unusually long sentence can be considered in determining whether a defendant shows an extraordinary and compelling reason if a defendant has served at least 10 years of that sentence and there is a change in the law (other than a Guideline amendment not made retroactive), and that change would produce a gross disparity between the sentence imposed and the sentence likely to be imposed at the time the motion was filed. Defendant meets none of these criteria.[5]

        Defendant claims "extraordinary rehabilitation." *Id.* at PageID.22380. Attached to her Motion and Supplement are multiple BOP Certificates of Completion and other evidence of rehabilitation. *See* ECF No. 1699-2 at PageID.22386–22395; ECF No. 1705-1 at PageID.22410–22426; ECF No. 1717-1, -2, and -3 at PageID.22706–22747. While commendable, rehabilitation standing alone is not a basis to grant a motion for compassionate release. And although the court may consider rehabilitation in combination with other circumstances in

---

[5] Further, Defendant has failed to provide any explanation as to how conditions of confinement due to COVID-19 impact her differently than other inmates. *See United States v. Vela*, 2025 WL 2210928, at *2 (D. Idaho Aug. 2, 2025) (stating that harsh conditions of confinement that the defendant "endured during the COVID-19 pandemic do not amount to an extraordinary and compelling reason at this time, when vaccines are available for COVID-19, and it is no longer a pandemic" and that "[f]inding these conditions to support an extraordinary or compelling circumstance would entitle every prisoner who was incarcerated during the pandemic to a sentence reduction").

11

determining whether and to what extent to reduce a term of incarceration, the court finds that the totality of the circumstances, including defendant's rehabilitation efforts, do not support granting the Motion.[6]

Whether viewed individually or in combination, Defendant has failed to show extraordinary and compelling reasons in support of her Motion.

## D.    The Relevant § 3553(a) Factors Do Not Support Granting the Motion

Relevant § 3553(a) factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" and (2) the need for the sentence imposed . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(1)–(2). And, under the parsimony clause, "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in § 3553(a)(2). 18 U.S.C.

---

[6] Defendant's low PATTERN score is not a basis under § 1B1.13 to find extraordinary and compelling reasons. *See United States v. Rosales-Zuniga*, 2024 WL 448383, at *5 (D. Or. Feb. 5, 2024); *United States v. Demming*, 2025 WL 1115610, at *6 (N.D. Ohio Apr. 15, 2025). Instead, the court addresses it when considering the relevant § 3553(a) factors.

§ 3553(a). Here, the relevant § 3553(a) factors do not support granting Defendant's Motion.[7]

The court starts with the offense conduct. Defendant engaged in three separate fraud schemes: (1) a tax fraud scheme involving the filing of over 300 false federal tax returns and 300 false state tax returns, with 50 separate taxpayer victims and an actual tax loss of over $2,700,000, ECF No. 1514 at PageID.17817–17824; (2) a credit card fraud scheme involving 34 credit cards, with over $1,000,000 fraudulently charged and over $140,000 charged-off by the banks, *id*. at PageID.17825–17827; and (3) an education fraud scheme involving fraudulent financial aid applications resulting in the disbursement of over $537,000, *id*. at PageID.17828–17832.

Defendant went to great lengths to conceal her illegal activity, directing fraud proceeds into at least 15 different bank accounts that she controlled or had access to. *Id*. at PageID.17834. She used a nonprofit organization, Mobile Native Hawaiian Health ("MNHH"), to obtain individuals' personal identifying information, to funnel fraud proceeds, and to provide apparent legitimacy to her

---

[7] This section largely tracks the court's discussion of the relevant § 3553(a) analysis in a previous order of the court denying a sentence reduction. *See United States v. Sullivan*, 2024 WL 5108275, at *2–5 (D. Haw. Dec. 13, 2024), *aff'd*, 2025 WL 2092841 (9th Cir. July 25, 2025).

fraud. *See, e.g., id*. at 17816–17817. She even used her minor son's bank account to deposit fraud proceeds. *See id*. at PageID.17806, 17816–17817.

> As the court stated at sentencing:
>
> [T]he criminal conduct across the board was staggering in its scope, length and complexity. It was staggering in the boldness in which Ms. Sullivan would engage in this conduct. . . . [W]hen I say bold, I mean it's just the sheer number of tax returns and credit cards and just the natural ability to lie and lie and lie. And it seems as if, when you look at this offense conduct, that lies come easier to Ms. Sullivan than the truth. And behind all of this is unrelenting greed. . . . And that's evidenced by both the offense conduct itself and by the fact that [Defendant] continued to engage in this conduct after indictment.

ECF No. 1579 (sentencing hearing transcript) at PageID.19547–19548.

Further, in weighing the nature and circumstances of the offense, Defendant engaged in obstructive (if not criminal) conduct after she was first indicted. On November 8, 2017, a First Superseding Indictment charged Defendant with the filing of false tax returns of T.K. and R.C. while the case against Defendant was pending. *See* ECF No. 1; ECF No. 27 at PageID.86; and ECF No. 1514 at PageID.17835. The United States filed a motion to revoke bail, and in response Defendant filed declarations of T.K. and R.C. stating that Defendant did not prepare the disputed tax returns. ECF No. 43-1 at PageIDs.305–307; ECF No. 43-2 at PageID.308–309. These declarations, however, were false.

14

*See* ECF No. 1514 at PageID.17835; ECF No. 41-3; ECF No. 41-5; and ECF No. 41-6.

Defendant also attempted to tamper with witnesses who testified before the grand jury. Several tax fraud victims reported that Defendant told them to assert a Fifth Amendment privilege in the grand jury, and Defendant texted grand jury witness S.D.: "Remember you answer 'don't know.' Even if you think you know." ECF No. 1514 at PageID.17836. D.M., a friend of S.D., testified that Defendant told him to lie to the grand jury regarding S.D. *Id*.

Defendant's obstructive conduct continued into an evidentiary sentencing hearing in which she testified. As stated by the court at sentencing, Defendant testified "that she never misrepresented that she was acting on behalf of a charitable institution, MNHH, in committing any offense. This clearly is material and false." ECF No. 1579 at PageID.19494. She also committed perjury when she testified that "Henry Tanner's mother gave her permission to use the information in the aid application, including stating that [he] was homeless." *Id*. at PageID.19498.

Defendant's criminal history is also a concern. Having completed law school, Defendant applied for a low-interest loan for Native Hawaiians with the Office of Hawaiian Affairs ("OHA"). ECF No. 1514 at PageID.17848. She was approved for the loan, under the condition that she pass the Hawaii State bar exam.

On October 15, 2004, defendant provided OHA with a "Notice of Passing" the bar. But when OHA called the Hawaii Supreme Court to confirm the results, it was determined that Defendant in fact failed the bar exam. Defendant fraudulently altered the Notice of Passing to include her name. *Id*. at PageID.17849. When asked by law enforcement about the bar results, Defendant blamed her sister, and denied altering the Notice of Passing. *Id*. This conduct resulted in a 2005 conviction in Hawaii State Court for tampering with a government record. *Id*. at PageID.17848. And several years later, in 2012, Defendant was convicted of seven counts of unauthorized computer access under Hawaii law. *Id*. at PageID.17850.

Despite the overwhelming evidence of Defendant's fraudulent conduct, she never accepted responsibility for her actions. As one example, she blamed others during her sentencing hearing. As the court stated,

> you've proven today in your allocution that you still haven't understood what you've done or accepted responsibility in any way. . . . And you got up here today and did what you always do, point a finger somewhere else. Point a finger somewhere else. You deflect blame and have no insight into your own wrongdoing.

ECF No. 1579 at PageID.19550–19551.

At sentencing, the court also commented on the paucity of mitigating evidence relating to the offense or in Defendant's history:

16

> Now, I looked and tried to determine what are the
> mitigating factors. And I tell you there's not much on
> that side of the ledger. I know that you have mental
> health issues. We've been through that. You have two
> children. I don't doubt that you love your children. I
> have no reason to doubt that. You're going to be a
> grandma soon apparently. But other than that, it's very
> hard for me to find mitigating evidence in this case. It's
> just very difficult to find in the record or even through
> the course of this litigation.

*Id*. at PageID.19552.

Given the totality of the circumstances, and taking into account the § 3553(a) factors and the parsimony clause, the court does not believe that reducing Defendant's sentence is appropriate. As the court stated at sentencing:

> And I'm going to say something I've said only a few
> times in my coming up, I guess, on 18 years as a judge,
> which is, I am firmly convinced that if you don't change,
> and I see no indication you have the insight to change,
> you will continue criminal conduct when you're released.
> I just see that as inevitable almost in your case. Because
> you refuse to look inward. You refuse to do so. Your
> own husband said that you're incapable of following the
> rules and think only of yourself. And that's what I've
> seen. Incapable of following the rules.

*Id*. at PageID.19551–19552.

The court has set forth some—but not all—of the scope and troubling nature of Defendant's conduct. The court has also taken into consideration the evidence Defendant has presented in favor of her Motion, including her extensive programming while incarcerated and her low PATTERN score. But, given the

17

totality of the evidence, a very significant sentence was (and remains) appropriate. A reduction in sentence would, in the court's view, result in a sentence that would not be sufficient to comply with the goals of sentencing set forth in § 3553(a)(2), to include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to protect the public from further crimes by the Defendant.

## IV.  <u>CONCLUSION</u>

Defendant's Motion for Compassionate Release—ECF No. 1699 in Cr. No. 17-00104 JMS and ECF No. 296 in Cr. No. 21-00096 JMS—is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 2, 2025.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge